1

2

3

4

5

6

7

8

9

10

11

12

13                    UNITED STATES DISTRICT COURT

14              FOR THE EASTERN DISTRICT OF CALIFORNIA

15

16    JAMES HENRY FLOURNOY,                    No.  2:11-cv-2844-KJM-EFB P

17                      Plaintiff,

18          v.                                 ORDER AND FINDINGS AND
                                               RECOMMENDATIONS
19    SACRAMENTO COUNTY SHERIFF
      DEP'T, et al.,
20
                      Defendants.
21

22          Plaintiff, James Henry Flournoy, is a state prisoner proceeding pro se and in forma

23    pauperis in an action brought under 42 U.S.C. § 1983.  The following defendants remain in the

24    case: (1) Richard Bauer, M.D.; (2) Glayol Sahba, M.D.; and (3) Deputy Joseph Kinder.

25          Generally, plaintiff alleges that he is mobility impaired and that Drs. Bauer and Sahba

26    improperly cancelled his prescriptions for a wheelchair[1] and physical theraphy.  He further alleges

27    _____

28          [1] As discussed herein, underlying the issues in this case is a dispute as to whether plaintiff
      has a legitimate medical need for a wheelchair.

                                               1

that Deputy Kinder used excessive force when, to remove plaintiff from a courtroom, he choked plaintiff until he was unconscious and threw him down a flight of stairs. Additionally, plaintiff alleges that Kinder maliciously prosecuted him by filing a false report regarding the incident, which led to a prosecution that was ultimately dismissed.

Defendants have filed motions for summary judgment. ECF Nos. 138–140. Also pending are Dr. Sahba's motion to strike plaintiff's surreply (ECF No. 159) and plaintiff's motion for leave to supplement his opposition to Kinder's motion for summary judgment (ECF No. 169). As discussed below, upon careful review of the record, it is recommended that: (1) Dr. Bauer's motion for summary judgment be granted; (2) Dr. Sahba's motion for summary judgment be granted; and (3) Deputy Kinder's motion for summary judgment granted in part and denied in part. Further, Dr. Sahba's motion to strike plaintiff's surreply should be granted; and plaintiff's motion to supplement his opposition to Kinder's motion for summary judgment should be denied.

# I.     Background

## A.     Facts Not Reasonably in Dispute

On or around October 16, 2009, a doctor at the California Department of Corrections and Rehabilitation ("CDCR") diagnosed plaintiff as a qualified individual with a disability due to being mobility impaired. ECF No. 164 at 95.[2] The disability placement program verification form stated that he was a full-time wheelchair user. *Id.*

Plaintiff arrived at the Sacramento County Main Jail ("Jail") from Deuel Vocational Institute ("DVI") on October 27, 2009. ECF No. 140-2 at 1; ECF No. 164 at 41. He was a pretrial detainee in criminal case 07F00432 in Sacramento County Superior Court ("Superior Court"). ECF No. 139-4 at 38, 42.

The intake nurse at the Jail documented that plaintiff needed a wheelchair because the nurse believed that plaintiff was "paraplegic" and had to "self-catheterize" to urinate. ECF No. 140-2 at 2; ECF No. 164 at 41. Whether plaintiff has a legitimate medical need for a wheelchair is at the core of plaintiff's claims in this action.

---

[2] Unless otherwise noted, page numbers for all cited documents in the record refer to the page stamp at the top, right-hand corner of the page.

At approximately 8:20 a.m. on October 28, 2009, Dr. Bauer requested to medically examine plaintiff. ECF No. 140-4 at 4; ECF No. 164 at 42–43. The same day, Dr. Bauer cancelled the wheelchair prescription. ECF No. 140-4 at 5; ECF No. 164 at 44–45.

On October 29, 2009, plaintiff had a court appearance in Superior Court for a criminal case. ECF No. 139-4 at 38. He crawled[3] from the elevators to the holding tank, then from the holding tank to the stairwell leading to Department 63. ECF No. 170 at 3. Two inmates carried him up the stairs and he waited his turn to go into the courtroom. *Id.* Then, he went to the secure holding area, or cage, in the courtroom. ECF No. 139-4 at 42, 48; ECF No. 170 at 4. At the end of his appearance, he started disrupting the proceedings by "pleading" with the judge at least twice to order the return of his wheelchair. ECF No. 139-4 at 42, 48; ECF No. 170 at 3.

Kinder, a Sacramento County Sheriff Deputy, forcibly removed plaintiff from the cage and dragged him along the floor to the stairwell. ECF No. 139-4 at 42, 48; ECF No. 170 at 4. Thereafter, plaintiff fell down the stairs, stopping on the landing one flight down. ECF No. 139-4 at 48; ECF No. 170 at 4. Deputy Kinder fractured his ankle during the incident. ECF No. 139-4 at 49. Kinder went to the hospital that day and was on light duty for six weeks. *Id.*

Plaintiff was seen at Sutter General Hospital after the incident. He complained of pain to his head, back, and neck from being pushed or thrown down the stairs. ECF No. 140-5 at 43; ECF No. 164 at 45–46; ECF No. 170 at 4. His X-rays showed no signs of fracture. ECF No. 140-5 at 49. However, the medical records state that his back showed "mild diffuse tenderness to the T-spine and LS spine," and he was diagnosed with "[a]cute cervical strain" and "[c]hronic neck and back pain." *Id.* at 49–50. Further, the records state that he was "medicated" with "Tylenol 975 mg" and taken back to the Jail "via wheelchair." ECF No. 170 at 74–76.

An incident report documents plaintiff's examination at Sutter General Hospital. ECF No. 140-5 at 18, 22–24. It states that he told a nurse that he could not sit up to take his pills but that, shortly thereafter, he sat up on his own without assistance and took his pills. *Id.* at 18, 23.

---

[3] The record does not clearly reflect whether he was crawling on his knees or scooting on his buttocks. Unless otherwise noted, the court uses the terms "crawling" and "scooting" interchangeably.

1   Further, it states that he said that he could not move his legs to sit in a wheelchair for transport

2   back to the Jail but that he was able to seat himself in the wheelchair.  *Id.* Additionally, it states

3   that, while sitting in the wheelchair and being restrained by a deputy, he started to stand up.  *Id.*

4   Moreover, it states that, while handcuffed, he was able to exit the wheelchair, enter the van, and

5   sit in the van's backseat with relative ease.  *Id.* at 18, 24.

6          On October 30, 2009, Dr. Sahba examined plaintiff.  ECF No. 138-4 at 3; ECF No. 156 at

7   10.  She allowed him to keep his wheelchair and prescribed physical therapy and pain medication.

8   ECF No. 138-4 at 3; ECF No. 156 at 11.

9          Dr. Bauer examined plaintiff on October 31, 2009.  ECF No. 140-4 at 6.  He concluded

10  that a wheelchair was medically inappropriate and contraindicated for him.  *Id.* at 7; ECF No. 164

11  at 50.

12         On November 6, 2009, Nurse K. Gonzales responded to a grievance that plaintiff filed

13  about the wheelchair.  ECF No. 140-5 at 3, 9–10.  She told plaintiff that he did not have a medical

14  condition requiring a wheelchair.  ECF No. 140-5 at 3–4, 11; ECF No. 164 at 54.  She reasoned

15  as follows: (1) medical staff was aware of his past incarceration at the Jail and medical history;

16  (2) the medical findings from Sutter General Hospital were normal; (3) Dr. Bauer noted that he

17  was able to lift his legs without assistance; and (4) staff had seen him walking, standing, and

18  bearing all of his weight on both of his legs.  ECF No. 140-5 at 3–4, 11.

19         On January 19, 2010, M. Sotak, Medical Director for the Jail, was informed by custody

20  staff that plaintiff was caught stashing, or hoarding, pain medication in his cell.  ECF No. 140-5 at

21  17–18, 25.  Dr. Sotak's note documenting the report states that he was found with one morphine,

22  six gabapentin, and two tramadol pills.  *Id.*  Therefore, per jail policy, Sotak immediately

23  discontinued all of plaintiff's narcotics pain medication.  ECF No. 140-5 at 17–18; ECF No. 164

24  at 55.  In the same note, Sotak wrote that custody staff had seen plaintiff standing up, that he was

25  malingering, and that he did not need a wheelchair.  ECF No. 140-5 at 18, 25.

26  /////

27  /////

28  /////

4

On January 23, 2010, Dr. Bauer wrote orders again indicating that plaintiff could walk and required a wheelchair only when transported for long distances. ECF No. 140-4 at 8. Further, he updated his orders to reflect that plaintiff had been caught stashing pain medications. ECF No. 140-4 at 8; ECF No. 164 at 56.

On February 10, 2010, Gonzales responded to a grievance that plaintiff filed about not being seen after submitting sick call slips for narcotics and a wheelchair. ECF No. 140-5 at 4, 13–14. While he had submitted many such requests, Gonzales notified him that the documentation in his medical chart showed that he did not need a wheelchair. *Id.* at 4, 14. The documentation also showed that he had been caught stashing medication and that he was thus no longer eligible to receive such narcotics per Jail policy. *Id.*

Further, the documentation showed that he saw a doctor on February 9, 2010, who increased his prescription pain medication Ultram to two times a day. *Id.*; ECF No. 164 at 57.

Dr. Sahba treated plaintiff on February 19, 2010. ECF No. 138-4 at 4, 20. He complained about toilet paper in his left ear and flu-like symptoms. ECF No. 138-4 at 4, 20; Pl.'s Dep. at 110.[4] Dr. Sahba diagnosed plaintiff with an upper respiratory infection and earwax impaction and prescribed him medication for these conditions. ECF No. 138-4 at 4, 20. She also ordered that he receive a flu vaccination after his upper respiratory infection resolved. *Id.*

On February 24, 2010, Dr. Bauer evaluated and treated plaintiff regarding his complaints of chronic pain and request for narcotics. ECF No. 140-4 at 9. Dr. Bauer informed plaintiff that because he was caught stashing medication he could not be prescribed narcotics. *Id.*; ECF No. 164 at 58. Further, Dr. Bauer determined that it was medically inappropriate to prescribe plaintiff a wheelchair for all ambulation. ECF No 140-4 at 9; ECF No. 164 at 59.

On March 13, 2010, John Ko, M.D., examined plaintiff at the Jail. ECF No. 140-4 at 9. The examination related to his alleged ambulation and lower extremity issues. *Id.*; ECF No. 164 at 59. Like Dr. Bauer, Dr. Ko concluded that it was not medically necessary for plaintiff to use a wheelchair. ECF No. 140-4 at 10; ECF No. 164 at 61. On April 10, 2010, Dr. Ko saw plaintiff

---

[4] Dr. Sahba filed a hard copy of plaintiff's deposition transcript. *See* ECF No. 138–7.

regarding his complaints of hip and thigh pain. ECF No. 140-4 at 10. Dr. Ko did not prescribe a wheelchair but increased plaintiff's pain mediation (Neurontin) to treat his complaints of pain. ECF No. 140-4 at 11; ECF No. 164 at 62.

On or about March 26, 2010, Dr. Sahba saw plaintiff. ECF No. 138-4 at 4, 23. Plaintiff complained of nausea, light-headedness, elevated body temperature, sweating, memory loss, and pain in his neck, thigh, waist, and back. *Id.* He also expressed concern about his cholesterol levels. *Id.* Dr. Sahba prescribed pain mediation and additional treatment for earwax impaction. *Id.* Further, she concluded that sugar crash likely caused his other symptoms. *Id.*

On May 4, 2010, Dr. Sotak granted plaintiff's request for a wheelchair. ECF No. 140-5 at 18; ECF No. 164 at 62.

On May 20, 2010, Dr. Sahba saw plaintiff. ECF No. 138-4 at 4, 25. Plaintiff asked for a second mattress pad, permission to use electric clippers to shave, physical therapy, and methadone. *Id.* Dr. Sahba ordered a second blanket to help plaintiff with his neck pain. *Id.* Further, Dr. Sahba requested physical therapy for plaintiff to strengthen his legs. *Id.* She gave plaintiff a doctor's note allowing him to use electric clippers to shave. *Id.* However, Dr. Sahba did not increase his pain medication, *id.,* nor did she prescribe methadone because of the stashing incident. *Id.* at 4, 25. Nevertheless, she added a muscle relaxant (Flexeril) to his prescriptions to help with his muscle pain. *Id.* at 5, 25.

On June 14, 2010, plaintiff was transferred from the Jail. ECF No. 140-2 at 9; ECF No. 164 at 63. On August 5, 2010, the CDCR determined that plaintiff required only intermittent use of a wheelchair. ECF No. 140-5 at 30; ECF No. 164 at 63.

On November 3, 2010, Dr. Darrin Bright of the CDCR examined plaintiff in connection with his request for a determination of his Americans with Disabilities Act ("ADA") status. ECF No. 140-5 at 32–33. Dr. Bright's examination report states that plaintiff "has no medical evidence that supports him being disabled." *Id.* at 33. Further, it states that it "has been well documented that [he] can stand." *Id.* Additionally, it states that plaintiff was "uncooperative" during the examination. *Id.* Based on Dr. Bright's findings, at least temporarily, the CDCR removed him from its disability placement program. *Id.*; ECF No. 164 at 65.

On February 15, 2011, Dr. Bright again examined plaintiff. ECF No. 140-5 at 34–35. Dr. Bright's examination report states that plaintiff "was uncooperative [during] the examination," and that he had "no obvious atrophy" and "poor motivation for walking." *Id.* Further, consistent with the findings of Drs. Bauer and Ko, Dr. Bright's report states that custody staff observed plaintiff standing up in a van and "moving around [it] . . . using his legs." *Id.* at 35. Dr. Bright concluded that plaintiff had no significant orthopedic or neurologic condition, did not need an accommodation, and did not qualify for a ground floor cell or low bunk chrono. *Id.*; ECF No. 164 at 66.

The Jail has an inmate grievance procedure in place to address inmate complaints, including those about medical care.[5] If an inmate grievance cannot be resolved informally, the inmate may file a formal written grievance on a form provided by the Sacramento County Sheriff's Department ("Sheriff's Department"). ECF No. 138-3 ¶¶ 4, 6 & Ex. C. Plaintiff attached his written grievances allegedly relating to Dr. Sahba to his second amended complaint. ECF No. 22 at 27–28.

The first grievance is dated January 29, 2010. *Id.* at 27. Therein, he complains about delays in Dr. Bauer seeing him. *Id.* He attributes this delay to Dr. Bauer retaliating against him for "past experiences" in which Dr. Bauer allegedly wrote him up and took his wheelchair. *Id.* This grievance does not mention Dr. Sahba. *Id.*

The second grievance is dated February 7, 2010. *Id.* at 28. Therein, *inter alia*, he appears to complain that he was denied a reasonable accommodation and wheelchair accessible housing. *See id.* Substantial parts of his grievance, however, are illegible. *Id.*

**B.      Dr. Bauer's Version of the Facts**

When plaintiff arrived at the Jail on October 27, 2009, he told the intake nurse that he had a wheelchair because he had paraplegia due to a car accident. ECF No. 140-4 at 4. The

---

[5] ECF No. 138-3 ¶¶ 2–6 & Exs. A–B; ECF No. 22 at 2; *see also Howse v. Walker*, No. CIV S-06-0331 DFL DAD P, 2007 WL 201161, at *1, 4 (E.D. Cal. Jan. 24, 2007) (noting that the Jail has an inmate grievance procedure), *report and recommendation adopted*, 2007 WL 934610, at *1 (E.D. Cal. Mar. 27, 2007); *Jones v. Blanas*, 2:03-cv-00119-JKS-DAD, 2005 WL 1868826, at *1–2 (E.D. Cal. Aug. 3, 2005) (same), *report and recommendation adopted*, 2:03-cv-00119-JKS-DAD (E.D. Cal. Sep. 16, 2005).

following day, he refused Dr. Bauer's request to examine him. *Id.* Dr. Bauer then inquired into his medical history. *Id.* It revealed that plaintiff did not need a wheelchair when he was at the Jail in 2007 and that he was observed walking without assistance in March 2008. *Id.* at 4–5. Furthermore, Dr. Bauer observed that plaintiff's legs lacked muscle atrophy. *Id.* at 5. The lack of muscle atrophy was a clear and strong medical finding that plaintiff had adequate control, coordination, and leg strength to walk without assistance. *Id.* Based on these findings, he cancelled the wheelchair prescription as medically unnecessary and contraindicated. *Id.*

During his October 31, 2009 examination, Dr. Bauer found plaintiff to be a poor, inconsistent historian who changed his story and reason why he required a wheelchair. *Id.* at 6. Initially, he informed Dr. Bauer that he could not walk after a motor vehicle accident in 2007. *Id.* Dr. Bauer told him that his medical history indicated that he did not require a wheelchair in 2007. *Id.* Further, Dr. Bauer told plaintiff that people had observed him walking without assistance in 2008, during which time he had a wheelchair issued to him. *Id.* Plaintiff responded that he had a car crash in April 2009 that aggravated a previous hip injury and rendered him unable to walk, and that he was in a wheelchair before this accident. *Id.* Then, he said that he was not paralyzed but unable to walk due to pain in his back and thighs. *Id.* This statement was inconsistent with his previous statements to Dr. Bauer and other medical providers. *Id.*

During the same examination, Dr. Bauer found plaintiff to have normal muscle tone and reflexes. *Id.* He also found plaintiff to have a negative Babinski reflex, which indicates that a patient has no signs of muscle weakness, muscle control deficits, or coordination losses in the lower extremities. *Id.* He exhibited no signs of a neurological deficit that would impair his ability to use his legs, and he appeared to be quite fit with a muscular build. *Id.* Further, Dr. Bauer observed that, while being taken upstairs, plaintiff lifted his legs off the ground so that they would not drag on the floor. *Id.* This indicated that he could move and use his legs without issue, though during the examination plaintiff said that he could not lift his legs. *Id.* Based on these findings and observations, Dr. Bauer concluded that plaintiff had no medically determinable impairment affecting his use of his lower extremities or his ability to ambulate normally. *Id.* at 6–7.

Nevertheless, Bauer took plaintiff's subjective yet medically unsubstantiated complaints into account. Based on subjective complaints Dr. Bauer allowed plaintiff use a wheelchair for transport over prolonged distances (e.g., court appearances). *Id.* at 7. Dr. Bauer discussed his findings with Dr. Sotak, who agreed with them. *Id.*

When a treatment modality is contraindicated, its use or the use of an assistive device may negatively affect the patient's health. *Id.* at 7. Had plaintiff used a wheelchair for ambulation and stopped using his lower extremities, he could have endured severe muscular and neurological deficits due to prolonged non-use of healthy, normal, and necessary muscles of the human anatomy. *Id.* Furthermore, prolonged sitting places an individual at greater risk of forming blood clots in the legs, which could travel to the lungs and potentially cause death. *Id.* at 7. For these reasons, Dr. Bauer disallowed plaintiff to use the wheelchair at all times. *Id.*

On November 5, 2009, Nurse Gonzalez saw plaintiff in his cell. ECF No. 140-5 at 3, 7. He was squatting and bearing all of his weight on both of his legs, and appeared to be speaking into his toilet to communicate with other inmates at the Jail. *Id.* Likewise, several sheriffs' deputies told Dr. Bauer that they saw him exercising in his cell, and that he tried to obstruct their view by blocking his cell window with a towel. ECF No. 140-4 at 8.

During his February 24, 2010 medical evaluation, plaintiff told Dr. Bauer that his re-injury to his hip in April 2009 was causing his chronic pain and inability to walk. *Id.* at 9. This contradicted his statement to Dr. Bauer in October 2009 that he could not walk because of back and thigh pain. Dr. Bauer offered to order X-rays for his hip to determine whether there was a condition causing him such pain. *Id.* Dr. Bauer did this despite the fact that plaintiff's records indicated that he was "stashing" and not taking his pain medication, a strong indication that one does not have chronic pain as claimed. *Id.* However, plaintiff refused Dr. Bauer's offer unless he first gave plaintiff a wheelchair. *Id.* Dr. Bauer denied a wheelchair for all ambulation based on the continued (1) lack of medical findings to substantiate impairment of his lower extremities and (2) inconsistent reports as to the cause of plaintiff's inability to walk.

Dr. Ko's March 13, 2010 examination of plaintiff was extensive. *Id.* He observed that, despite plaintiff's assertion that he could not use his legs and needed a wheelchair, he showed no

evidence of muscle wasting to his lower extremities. *Id.* at 10. Further, he exhibited zero atrophy in his legs. *Id.* He was not fully cooperative when asked to perform muscle testing. *Id.* at 9–10. Although he stated that he could not move his lower extremities, Dr. Ko could clearly feel him contract his thigh muscles. *Id.* at 10. Additionally, Dr. Ko found that he had full strength, normal reflexes, and normal sensation of all of his extremities. *Id.* He observed plaintiff scooting backwards on the floor and noticed that he used his lower extremity muscles. *Id.* He also observed him engage his lower extremity muscles with ease and without any signs of pain while transferring from a chair into a wheelchair. *Id.*

Moreover, Dr. Ko noted that mid- and lower-back X-rays from Sutter General Hospital were unremarkable, and that cervical spine X-ray showed only a slight decrease in the disc height of plaintiff's C5 vertebrae. *Id.* Based on these findings, Dr. Ko concluded that plaintiff had no pathology to cause lower extremity weakness and did not qualify for a wheelchair, which raised a high suspicion of malingering.

Dr. Ko saw plaintiff on April 10, 2010 regarding his complaints of hip pain and lower extremity thigh pain. *Id.* Ko found that plaintiff's complaints of pain were unsubstantiated. *Id.* Although plaintiff alleged that his pain was ten out of ten, he did not appear to be in any pain or distress and did not even wince. *Id.* He again requested a wheelchair and said he could not move his legs. *Id.* But Dr. Ko determined that plaintiff (1) did not qualify for a wheelchair based on his medical findings and (2) was malingering, noting that officers had seen him standing and crouching without issue. *Id.* at 10–11. Although Dr. Ko ordered that plaintiff's pain medication (Neurontin) be increased to treat his subjective complaints of pain, Ko did not grant plaintiff full time use of the wheelchair. *Id.* at 11.

When Dr. Sotak granted plaintiff's request for a wheelchair on May 4, 2010, he did not do so based on medical need or a medical provider's findings or recommendations. ECF No. 140-5 at 18. Rather, he gave plaintiff a wheelchair so that (1) custody staff did not have to constantly deal with his theatrical crawling on the floor and (2) to grant them greater convenience in dealing with plaintiff. *Id.* at 18–19.

/////

### C.    Dr. Sahba's Version of the Facts

From October 2009 through June 2010, Dr. Sahba worked part-time as a physician for the County of Sacramento's Correctional Health Services, providing physician services to inmates in the Sacramento County jails. ECF No. 138-4 ¶¶ 2, 4. In this capacity, she had no supervisory duties with respect to any other physicians. *Id.* ¶ 3.

When assigned the Jail, she would be assigned to 2 East/2 Medical or as the physician on MD Sick Call. *Id.* ¶ 5. The physician assigned to 2 East/2 Medical sees inmates housed on 2 East or 2 Medical, or new intakes routed through 2 Medical. *Id.* The physician assigned to MD Sick Call sees inmates housed on the other Jail floors. *Id.* Only one physician is assigned to work each assignment during each shift. *Id.* Therefore, if Dr. Sahba was working on 2 East/2 Medical, she would not be working on MD Sick Call, and vice versa. *Id.*

Medical practice at the Jail is a group practice. *Id.* ¶ 9. Inmates are not assigned primary care physicians. *Id.* Rather, each day, nurses prepare the lists of patients for doctors to see at each work assignment. *Id.* at ¶¶ 6–9. Inmates are not told which doctors will be working on a given day. *Id.* ¶ 9.

Dr. Sahba examined plaintiff on October 30, 2009. *Id.* ¶ 11. She found no paraplegia or muscle atrophy and inconsistent strength test results. *Id.* ¶ 13. Although she could not rule out that he had a medical condition was causing him to lose strength in his lower extremities, she could not rule out that he was feigning his condition. *Id.*

Dr. Sahba was reluctant to prescribe permanent wheelchair use without medical justification. *Id.* ¶ 15. In her professional opinion, patients who can walk should so that they do not become wheelchair-dependent or experience side effects of immobility (e.g., muscle atrophy, arthritis, or pressure sores). *Id.* Accordingly, she asked the Jail to obtain his medical records regarding wheelchair use from DVI and San Quentin so that the physicians in the group could further assess his needs. *Id.* ¶ 14. However, she was not the physician assigned to review these records. *Id.* ¶ 27.

/////

/////

Dr. Sahba allowed plaintiff to keep his wheelchair for the time being. *Id.* ¶ 14. Further, she ordered physical therapy so that he could increase his strength. *Id.* ¶ 15. She also ordered pain medications (MS Contin, Neurontin, and Naprosyn) for him. *Id.*

Dr. Sahba examined plaintiff three more times (February 19, 2010, March 26, 2010, and May 20, 2010). *Id.* ¶¶ 16, 18, 20. At these evaluations, he complained of various ailments unrelated to his alleged mobility impairment and need for a wheelchair. *Id.* ¶¶ 16–24. She treated all of these ailments. *Id.*

### D.     Deputy Kinder's Version of the Facts

At the end of his courtroom appearance on October 29, 2009, plaintiff was waiving paperwork through the bars of his cage and arguing with the judge. ECF No. 139-4 at 42. N. O'Brien, a Sacramento County Sheriff's Deputy, instructed plaintiff more than once to leave, but he refused. *Id.* at 41–42. Then, O'Brien radioed Kinder due to the disruption plaintiff was causing, including stopping the proceedings. *Id.* at 42.

When he arrived, Deputy Kinder observed plaintiff sitting on the floor of the cage, trying to get the judge's attention. *Id.* at 48. He quietly asked plaintiff to exit the courtroom. *Id.* at 42, 48. He did not comply, continuing to talk loudly to the judge and to wave his arms. *Id.*

Thereupon, Deputy O'Brien instructed Kinder to remove plaintiff from the courtroom. Kinder took hold of plaintiff's shirt with both hands and slid him across the floor and out of the courtroom to the stairwell. *Id.* at 48. Kinder then reached for plaintiff's left shoulder to roll him onto his stomach to handcuff him. *Id.* Despite Kinder's attempts to control plaintiff, he pulled away and slid in a slow and controlled manner down the stairs. *Id.*

Kinder completed a casualty report concerning the incident and his ankle injury. *Id.* at 49. He forwarded it to another office, which in turn completed a Crime Report. *Id.* A Crime Report is a set of documents that the Sheriff's Department uses to detail an incident that may involve chargeable crimes. *Id.* Thus, a Crime report may be referred to the Sacramento County District Attorney's Office ("prosecutor") for possible prosecution. *Id.* Other than providing statements to the interviewing officers, Deputy Kinder did not author or complete a Crime Report regarding the incident. *Id.*

J. Kelly, a Sacramento County Sheriff's Deputy, investigated the incident.  ECF No. 139-5 at 8.  As the investigating officer, Kelly completed a Crime Report.  *Id.*  He submitted it to the prosecutor for a felony charge of resisting a peace officer and a misdemeanor charge of contempt of court.  *Id.*

In February 2010, Kinder and O'Brien testified under oath at a preliminary hearing regarding the incident in Superior Court.  ECF No. 139-4 at 43, 49.  After the hearing, the Superior Court found probable cause to hold plaintiff to answer for the crime of resisting a peace officer in criminal case 09F08164.  ECF No. 139-5 at 24–25, 28.

In April 2010, both the felony and misdemeanor charges in criminal case 09F08164 were dismissed for insufficient evidence.  *Id.* at 54; ECF No. 170 at 5, 94.  On or about May 28, 2010, plaintiff entered a plea of no contest to second degree felony robbery in criminal case 07F00432.  ECF No. 139-5 at 30.

**E.      Plaintiff's Version of the Facts**

In 2006, plaintiff was assaulted with a baseball bat, resulting in a pelvis fracture.  ECF No. 164 at 179, 206, 208, 214.  In January 2007, he was in a rollover automobile accident that, *inter alia*, aggravated this injury (e.g., causing his leg to go numb) and caused him lower back pain.  *See id.* at 210, 212, 214–17.

Thereafter, on January 12, 2007, he received a health screening at the Jail.  *Id.* at 213.  He was found to have special needs for a wheelchair and a sling for his arm, which he injured in the automobile accident.  *Id.*  In January and February of 2007, he received physical therapy at the Jail.  *Id.* at 214–15.

In April 2007, he could not walk.  *Id.* at 71, 250.  In May 2007, he was prescribed a wheelchair for court appearances.  *Id.* at 172.

In March 2009, as he walked up a hill at San Quentin, his back went out and he re-aggravated his hip injury.  *Id.* at 217–18.  At this time, he became a full-time wheelchair user and remained one until Dr. Bauer discontinued his wheelchair prescription on October 28, 2009.  *Id.* at 73, 78, 217–19, 226.

/////

13

On October 27, 2009, when he was transferred to the Jail, his medical records accompanied him. *Id.* at 42. They stated that he had his own wheelchair and listed his prescription medications. *Id.* at 69.

Upon arrival, he told the nurse that he was mobility impaired and could not walk. *Id.* at 68. The nurse erroneously interpreted his statement to mean that he was paralyzed. *Id.* He did not tell the nurse that he had to self-catheterize to urinate. *Id.* at 42.

Dr. Bauer had the medical records that arrived with him. *Id.* at 69. Nevertheless, around 8:00 a.m. the following day, Dr. Bauer called him out of his cell for an examination. ECF No. 22 at 7; ECF No. 164 at 42. He did not sign up for this appointment. ECF No. 164 at 70. Furthermore, he was not accustomed to waking up this early and was sedated from pain medication. *Id.* Therefore, he politely refused to be examined and asked to be rescheduled. *Id.*

Dr. Bauer and plaintiff had a heated argument when he refused plaintiff's request to reschedule. *Id.* at 70. Dr. Bauer told him that he would take his wheelchair if he did not comply with the examination. ECF No. 22 at 7; ECF No. 164 at 70, 112. Plaintiff told him that he could review the medical records that arrived with him and returned to his cell. ECF No. 22 at 7; ECF No. 164 at 70. To retaliate against plaintiff for refusing to be examined, Dr. Bauer discontinued his wheelchair prescription. ECF No. 164 at 71–72.

At some point that day, plaintiff met with Dr. Bauer for three to five minutes. *Id.* at 70. He wore loose-fitting cotton pants, making it impossible for Dr. Bauer to tell whether he had atrophy in his legs. *Id.* In fact, plaintiff had atrophy in his lower extremities from using a wheelchair full-time for seven months. *Id.* at 71.

According to plaintiff, Deputy Kinder did not order plaintiff to exit the cage. ECF No. 170 at 4. Rather, Kinder entered it and immediately put plaintiff in a headlock and dragged him to the stairwell, choking him out in the process. *Id.* Plaintiff states that Kinder "had expressions of hatred across his face and in his voice as he said[,] 'I don't give a fuck! I will throw you down these stairs.'" *Id.* Plaintiff states that he did not resist except to try to tell Kinder that he was choking him because of the tightness of the headlock. *Id.* "Following Kinder's threat[,] he threw [plaintiff] down the flight of stairs[,] causing [him] to [lose] consciousness." *Id.*

14

Plaintiff says that he regained consciousness on the landing at the bottom of the stairwell. *Id.* He was in pain. *Id.* As EMTs lifted him onto a gurney, he heard Kinder say, "Damn it, this is a lawsuit." *Id.* at 5.

Plaintiff says that Kinder's assertion in the casualty report that plaintiff refused an order to exit the cage was untrue. *Id.* at 5. He also says that Kinder lied about the incident at the preliminary hearing in criminal case 09F08164. *Id.* Specifically, plaintiffs says that Kinder's assertion that plaintiff refused an order to exit the cage and resisted arrest was false. *Id.*

During the October 30, 2009 visit with Dr. Sahba, plaintiff told her that he feared that Dr. Bauer would retaliate against him by taking his wheelchair again. ECF No. 156 at 53. She allegedly told him that his wheelchair prescription would not be discontinued, and that Dr. Sotak had given her permission to let plaintiff keep the wheelchair and to prescribe physical therapy. *Id.* Furthermore, plaintiff says, Dr. Sahba had access to his medical records during this visit, which showed that he was disabled and had been prescribed a wheelchair. *Id.*

On October 31, 2009, plaintiff unsuccessfully objected to Dr. Bauer's examination. ECF No. 164 at 75. Dr. Bauer told plaintiff that he had to submit to the examination or he would discontinue Dr. Sahba's wheelchair prescription. *Id.* Contrary to Dr. Bauer's assertion, he was not an inconsistent historian who changed the reasons that he needed a wheelchair. *Id.* at 75–76. Rather, he says he informed Dr. Bauer of his "medical etiologies in chronological order that contributed to aggravating [his] March 2009 injury[] . . . that made [him] a full-time wheelchair user." *Id.* at 76.

Plaintiff says that during this examination, he "was only able to stand up and bear full weight on [his] lower extremities [for] 3 to 5 seconds." *Id.* at 77. Furthermore, Dr. Bauer asked him to move both of his legs the same way, but he could not. *Id.* Additionally, plaintiff disputes Dr. Bauer's assertion that he had normal muscle tone and a negative Babinski reflex. He contends that, when he was a full-time wheelchair user from March 5, 2009 to October 28, 2009, he "endured severe muscular atrophy in [his] lower extremities." *Id.* at 78; *see also id.* at 129–31.

/////

/////

15

When the assessment was over, Dr. Bauer offered him a walker instead of his wheelchair. *Id.* at 77. When plaintiff told him that he would think about it, Dr. Bauer allegedly got mad and discontinued his wheelchair and physical therapy. *Id.*

Plaintiff told James Austin, Nurse Practitioner, three separate times between December 2009 and January 2010 that he needed to see Dr. Sahba about his "need of physical therapy and a wheelchair." ECF No. 156 at 51; *see also id.* at 75–76. Dr. Sahba knew about these requests because it was standard practice at the Jail for nurses to determine which patients needed to be seen and relay that information to the physicians. *Id.* at 50, 70.

Plaintiff contends that Nurse Gonzalez did not see plaintiff in his cell bearing all of his weight on both legs. *Id.* at 78. Although plaintiff has no recollection of the incident, he suggests that he might have been trying to use the toilet. *Id.* at 52–53.

Plaintiff asked Dr. Sahba for a wheelchair during his February 19, 2010 appointment with her. *Id.* at 56. She denied this request. *Id.*

Plaintiff says he crawled to his February 24, 2010 appointment with Dr. Bauer, which he had done for all but one medical appointment. ECF No. 164 at 80. He told Dr. Bauer that he was suffering hip, back, and arm pain, which constantly crawling on the floor exacerbated. *Id.* Dr. Bauer did not perform any medical tests on him or touch him to determine his level of pain. *Id.* Contrary to Dr. Bauer's assertion, plaintiff says he did not refuse to be X-rayed. *Id.* Rather, he told Dr. Bauer that he would undergo X-rays if Dr. Bauer would transport him to the X-ray room in a wheelchair, which Dr. Bauer refused to do. *Id.* Further, plaintiff disputes that he gave Dr. Bauer inconsistent reports regarding his inability to walk, telling him the same thing he told him during the October 31, 2009 examination. *Id.*

Plaintiff says he crawled to this March 13, 2010 appointment with Dr. Ko. *Id.* at 81. He says did not give intentionally poor effort on muscle testing. *Id.* Furthermore, he claims that he showed evidence of atrophy in his legs and muscle wasting to his lower extremities. *Id.* at 81–82. He asserts that he had such impairments because he was a full-time wheelchair user for so long. *Id.* He also asserts that due to these impairments, it was impossible for Dr. Ko to find that he had full strength in his legs. *Id.* at 81. Additionally, he says he did not tell Dr. Ko that he could not

16

use his legs. *Id.* Rather, he complained about his inability to bear full weight on his lower extremities without experiencing severe pain in that area, including his groin, hip, and lower back. *Id.* Likewise, he did not say that he could not move his thigh or lower leg or press his foot and toes against Dr. Ko's hand. *Id.* at 81.

Plaintiff says he asked Dr. Sahba for a wheelchair at his March 26, 2010 appointment with her. ECF No. 156 at 56. He asserts that the nurse's notes that she reviewed during this visit stated that he dragged himself on his buttocks to the nurse sick call station on one or more occasions. *See* ECF No. 156 at 51, 55, 60, 75–76, 174. He also asserts that, before the visit, Dr. Sahba had seen him crawling on the floor multiple times. *Id.* at 55. This is partly because her workstation on 2 East was less than three feet away from the pod in which he was housed. *Id.* at 55, 58–59. Furthermore, he says that once he crawled past her on an unsanitary floor when she was in the doctor's examination area and he told her that he had repeatedly signed up to see a doctor about a wheelchair. ECF No. 22 at 12. Nevertheless, she did not order a wheelchair.

Plaintiff contends that the grievance coordinator would inadequately address his complaints. ECF No. 164 at 91. Instead of investigating them or interviewing him face to face, he would receive an "improperly adjudicated response that would have Dr. Bauer's fingerprints all on it (not literally) concerning the reasons for the denial of treatment." *Id.* Also, he generally avers that Dr. Bauer's "influence" caused him to experience further "harassment and retaliation," such as being "placed in a suicide gown in a freezing cell for non-psychiatric reasons" and on total separation. *Id.*

On June 14, 2010, he was transferred to DVI. *Id.* at 83; ECF No 140-5 at 27. The alleged deliberate indifference of Drs. Bauer and Sahba caused or aggravated various physical and mental health problems. ECF No. 164 at 83. These include chronic pain, nerve damage in his hand from scooting, nightmares, sleeping problems, depression, anxiety, and PTSD. *Id.* at 83, 268–78. Furthermore, he was prescribed methadone upon returning to the custody of the CDCR. *Id.* at 84, 284. This shows that the pain medications that he was prescribed at the Jail (tramadol/Ultram, gabapentin/Neurontin, and cyclobenzaprine/Flexeril) were ineffective. *Id.* at 83–84, 281.

/////

At DVI, he worked with his primary care doctor (Dr. Zachariah) extensively to rehabilitate himself. *Id.* at 84. These efforts, coupled with the prescription of methadone, allowed him to progress and stand for longer without severe pain in his groin, hip, back, and other lower extremities. *Id.* Nevertheless, he still had leg weakness and was limited to walking five steps and/or ten feet. *Id.* at 84, 292. Due to his progress, he was changed from a full-time wheelchair user to a part-time on August 5, 2010. *Id.*

Plaintiff transferred to Salinas Valley State Prison ("SVSP") on or about September 1, 2010. *Id.* at 84. Dr. Zachariah told him to submit a request for physical therapy when he got there, which he apparently did in December 2010. *Id.* at 84, 293.

Plaintiff disputes various findings of Dr. Bright's November 3, 2010 removal of him from the CDCR's disability placement program. For instance, he says that he did not stand up and rock the van during transport to SVSP and could not have because it is impossible to stand up in one. *Id.* at 84. Further, plaintiff asserts Dr. Bright erroneously found that plaintiff did not have a wheelchair when he arrived at SVSP. *Id.* at 85. For, although he "was lifted out of [his] wheelchair at DVI and tossed in a van headed to [SVSP]," he was "lifted out of the van . . . and placed in a wheelchair" upon arriving at SVSP. *Id.* at 89. Additionally, he was wheeled to his cell. *Id.*

Moreover, he asserts that he was never fully removed from the disability placement program. To bolster this assertion, he submits evidence indicating that he: (1) used a wheelchair on at least two days in January 2011, *id.* at 295–96; (2) was prescribed an ankle-foot brace in March 2011 as a part of his physical therapy, *id.* at 255, 300; and (3) was prescribed physical therapy when he was transferred out of SVSP in late March 2011, *id.* at 129–30.

### F.     Procedural Background

Plaintiff's second amended complaint is operative. ECF No. 22. The court screened it and found that plaintiff asserted the following potentially cognizable claims: (1) a claim under the ADA against Dr. Bauer; (2) a claim for deliberate indifference to medical needs under the Eighth Amendment against Drs. Bauer and Sahba; (3) a due process claim against Dr. Sotak; (4) an excessive force claim against Kinder; and (5) a § 1983 malicious prosecution claim against

Kinder. ECF No. 24 at 1–2. Subsequently, the court dismissed the ADA claim against Dr. Bauer, ECF Nos. 61, 68, and the due process claim against Dr. Sotak, ECF No. 77.

Dr. Bauer moves for summary arguing that plaintiff's deliberate indifference claim fails because (1) he did not have an objectively serious need for a wheelchair and physical therapy and (2) Dr. Bauer did not have a sufficiently culpable state of mind. ECF No. 140-7 at 14–25. He also argues that he is entitled to qualified immunity. *Id.* at 25–26.

Dr. Sahba seeks summary judgment, arguing that she could not have been deliberately indifferent to plaintiff's medical needs because she had no authority to reverse Dr. Bauer's decision to cancel his wheelchair and physical therapy prescriptions. ECF No. 138-1 at 12. Second, like Dr. Bauer, Dr. Sahba argues that plaintiff's deliberate indifference claim fails because: (1) plaintiff did not have an objectively serious need for a wheelchair and physical therapy; and (2) Dr. Sahba did not have a sufficiently culpable state of mind. *Id.* at 13–17. Third, she raises the defense of qualified immunity. *Id.* at 17–19. Alternatively, she argues that plaintiff failed to exhaust his claims against her because plaintiff allegedly did not mention her in his relevant administrative grievances. *Id.* at 19–20.

Kinder moves for summary judgment arguing that plaintiff's excessive force claim fails because Kinder simply slid plaintiff along the floor and attempted to roll him onto to his stomach and handcuff him, whereupon plaintiff broke free and accidentally slid down the stairs. *See* ECF No. 139-6 at 11–14. Furthermore, he argues that plaintiff's malicious prosecution claim fails for various reasons (e.g., the prosecutor made an independent determination to charge him). *Id.* at 14–20. In addition, Kinder argues that qualified immunity shields him from both plaintiff's excessive force and malicious prosecution claims. *See id.* at 21–22.

Plaintiff has opposed each of these motions. ECF Nos. 156, 164, 170. His arguments are drawn-out and excursive, and in the interest of clarity and efficiency are only summarized where relevant in the analysis below.

Plaintiff filed a surreply to Dr. Sahba's reply to his opposition to her motion for summary judgment. ECF No. 158. His surreply largely rehashes arguments that he made in his opposition and does not clearly identify any new arguments that Dr. Sahba raised in her reply. *See generally*

19

*id.* at 1–24.  Dr. Sahba has moved to strike the surreply, contending that it is "unauthorized" under Local Rule 230(l).  ECF No. 159 at 1.

Also, plaintiff has moved for leave to supplement his opposition to Kinder's motion for summary judgment.  ECF No. 169.  Therein, he seems to ask the court to consider the attachment to this motion as a part of his opposition to Kinder's motion for summary judgment.  However, the information in the attachment is redundant with information in his opposition.  *See id.* at 7–11.

## II.     Standard of Review

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant.  *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).  At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995) (per curiam).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures. Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own. When the opposing party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim. *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 324 (citation omitted) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id*. at 322. In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in [Rule 56(a)], is satisfied." *Id.* at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Whether a factual dispute is material is determined by the substantive law applicable for the claim in question. *Id.* If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

/////

/////

Second, the dispute must be genuine.  In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question.  Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim.  Conclusory allegations unsupported by evidence are insufficient to defeat the motion.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial.  *Anderson*, 477 U.S. at 248; *Devereaux*, 263 F.3d at 1076 (citations omitted).  More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a reasonable jury "could return a verdict for [him] on the evidence presented."  *Anderson*, 477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility.  It believes the opposing party's evidence and draws inferences most favorably for the opposing party.  *See id.* at 249, 255; *Matsushita*, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences.  *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 837 (9th Cir. 1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322).  If reasonable minds could differ on material facts at issue, summary judgment is inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  On the other hand, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant summary judgment.

/////

/////

/////

/////

1    **III.    Analysis**

2         **A.    Preliminary Matters**

3              **1.    <u>Motion to Strike Surreply</u>**

4         "Parties do not have the right to file surreplies and motions are deemed submitted when

5    the time to reply has expired." *Henry v. Cate*, No. 1:14–cv–00791–LJO–SKO (PC), 2015 WL

6    4249878, at *1 n.3 (E.D. Cal. July 13, 2015) (citing E.D. Cal. L.R. 230(l)), *report and*

7    *recommendation adopted*, 1:14–cv–00791–LJO–SKO (PC) (E.D. Cal. Aug. 10, 2015).  Surreplies

8    are generally disfavored.  *Id.* (citation omitted).  "[C]ourts have the discretion to either permit or

9    preclude a surreply."  *Id.* (citing cases).  When a party wishes to file a surreply, the proper

10   procedure is to seek leave to file one.  *See Garcia v. Biter*, 195 F. Supp. 3d 1131, 1132 (E.D. Cal.

11   2016).

12        "In this Circuit, courts are required to afford pro se litigants additional leniency."  *Id.* at

13   1134 (citing cases).  "This leniency, however, does not extend to permitting surreplies as a matter

14   of course and the Court is not generally inclined to permit surreplies absent an articulation of

15   good cause why such leave should be granted."  *Id.*  Good cause may include the need to address

16   new arguments raised in a reply brief.  *Hill v. England*, No. CVF05869RECTAG, 2005 WL

17   3031136, at *1 (E.D. Cal. Nov. 8, 2005) (citation omitted).

18        Here, plaintiff did not timely seek leave to file his surreply.  Rather, he belatedly asked the

19   court to allow him to file his surreply in his opposition to the motion to strike.  ECF No. 160 at 1.

20   Furthermore, he has not shown good cause to file the surreply, such as to respond to new

21   arguments raised in a reply brief.  *See id.* at 3–4.  Accordingly, Dr. Sahba's motion to strike

22   plaintiff's surreply is granted.

23              **2.    <u>Motion for Leave to Supplement Opposition</u>**

24        The attachment that plaintiff seeks to include with his opposition duplicates information in

25   the opposition.  Therefore, his motion for leave to supplement it is denied as superfluous.

26   /////

27   /////

28   /////

## B. Eighth Amendment—Deliberate Indifference to Medical Needs[6]

The Eighth Amendment protects prisoners from inhumane methods of punishment and inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Extreme deprivations are required to make out a conditions-of-confinement claim, and "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation omitted). "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (citations omitted). "The circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred." *Id.* "The more basic the need, the shorter the time it can be withheld." *Id.* (citations omitted).

To prevail on an Eighth Amendment claim predicated on the denial of medical care, a plaintiff must show that: (1) he had a serious medical need; and (2) the defendant's response to the need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To establish a serious medical need, the

---

[6] Plaintiff was transferred to the Jail as a pretrial detainee in criminal case 07F00432 in Superior Court. ECF No. 139-4 at 38, 42. Eighth Amendment standards still apply to his claim for deliberate indifference to medical needs. *See, e.g.*, *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003) (citation omitted). Granted, "a pretrial detainee who asserts a due process claim for *failure to protect* [must] prove more than negligence but less than subjective intent— something akin to reckless disregard." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (emphasis added). However, plaintiff asserts a claim for deliberate indifference to medical needs. Furthermore, the facts in *Castro* are inapposite. There, the defendants confined the plaintiff to a sobering cell because he was drunk. *Id.* at 1064. Later, they confined a combative inmate to the same cell, which had no audio or video surveillance and only occasional monitoring. *Id.* at 1064, 1067. Within hours, he severely beat and injured the plaintiff. *Id.* at 1064. The plaintiff in *Castro* did not challenge the quality of medical care he received for his injuries, but rather, the defendants' decision to "hous[e] him in the sobering cell with [the combative inmate] and by failing to maintain appropriate supervision of the cell." *Id.* at 1065. This case presents no such facts or theories of relief. Therefore, the court applies the familiar deliberate indifference standard that has "long applied . . . to claims that a government official failed to address medical needs." *Castro*, 833 F.3d at 1085 (Ikuta, J., dissenting) (citing cases). Yet, even if *Castro*'s "reckless disregard" standard applied, plaintiff's claim for deliberate indifference to medical needs would fail. *Infra* at 35 n.11.

24

plaintiff must show that the "failure to treat [the] . . . condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett*, 439 F.3d at 1096 (citation omitted). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

For a prison official's response to a serious medical need to be deliberately indifferent, the official must "'know[] of and disregard[] an excessive risk to inmate health.'" *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Furthermore, it is well-established that "a mere difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alterations in original) (citation omitted).[7] This rule applies whether the difference is between the medical professional(s) and a prisoner or two or more medical professionals.[8] In appropriate cases, however, a prisoner may state a claim of deliberate indifference to medical needs based on a difference of medical opinion. To do so, the prisoner must show that "the course of treatment the doctors chose was medically unacceptable under the

---

[7] *See also Estelle*, 429 U.S. at 107; *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation omitted); *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014) (citation omitted); *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citation omitted); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (citing cases); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Randall v. Wyrick*, 642 F.2d 304, 308 & n.9 (9th Cir. 1981) (citing cases); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970) (per curiam); *Stiltner v. Rhay*, 371 F.2d 420, 421 n.3 (9th Cir. 1967).

[8] *Hamby*, 821 F.3d at 1092 (citation omitted); *Colwell*, 763 F.3d at 1068 (citation omitted); *Snow*, 681 F.3d at 987 (citation omitted).

circumstances," and that they "chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson*, 90 F.3d at 332 (citations omitted). Under this rule, denying an inmate a kidney transplant based on "personal animosity" rather than "honest medical judgment" would constitute deliberate indifference. *Id.*

### 1.    Whether Plaintiff Had a Serious Medical Need

Whether plaintiff had a continuing need for a wheelchair was a key dispute between plaintiff and medical staff at the jail which is addressed further below. But a threshold question arises as to whether plaintiff had a serious medical need at all. Defendants argue that he did not. But a reasonable jury could conclude on this record that plaintiff had an objectively serious mobility impairment in his lower extremities. Plaintiff's evidence, if believed, indicates that he was assaulted with a baseball bat in 2006, which fractured his pelvis and resulted in residual impairments. ECF No. 164 at 179, 206, 208, 214. His evidence also suggests that he was in a rollover automobile accident in 2007, which aggravated this injury and caused him lower back pain. *See id.* at 210, 212, 214–15, 216–17. Furthermore, his evidence shows that, around the time of the accident, he received a health screening at the Jail and was found to have at least some special needs for a wheelchair, although that need is disputed and far from clear. *Id.* at 213. Additionally, in January and February of 2007, he received physical therapy at the Jail. *Id.* at 214–15. Moreover, his evidence could support a finding that he continued to have some mobility problems into the spring of 2007. *Id.* at 71, 172, 250.

His evidence further indicates that, in March 2009, his back went out and he re-aggravated his hip injury. *Id.* at 217–18. In addition, his evidence could support a finding at trial that, at this time, he became a full-time wheelchair user even if the medical need for that use was unresolved. *Id.* at 73, 78 217–19, 226. Indeed, on or around October 16, 2009 (about two weeks before he was transferred to the Jail), the CDCR designated him as a qualified individual with a disability due to being mobility impaired. ECF No. 22 at 7; ECF No. 164 at 95. And the disability placement program verification form states that he was a full-time wheelchair user. ECF No. 164 at 95. Finally, his evidence could reasonably support a finding at trial that, whatever the degree

/////

of the impairment, his mobility impairment caused him pain, *see, e.g.*, *id.* at 83–84, 281, and it is undisputed that he scooted around the Jail for months.

Thus, setting aside the ultimate question of whether there was a legitimate medical need for full time use of a wheelchair, the record would permit a reasonable jury to conclude that a failure to treat his alleged mobility impairment would "result in further significant injury or the unnecessary and wanton infliction of pain." *Jett*, 439 F.3d at 1096 (citation omitted). That is, the evidence would permit a finding that plaintiff had some form of a mobility impairment that "a reasonable doctor or patient would find important and worthy of comment or treatment," or that "significantly affect[ed] [his] daily activities," or that caused him "chronic and substantial pain." *McGuckin*, 974 F.2d at 1059–60. Several cases support this conclusion.[9]

Drs. Bauer and Sahba argue that he did not have an objectively serious medical need. For his part, Dr. Bauer contends that his findings show that he did not have an objectively serious medical need. ECF No. 140-7 at 14–20. Furthermore, he asserts that other medical providers (i.e., Dr. Sotak, Dr. Ko, and Nurse Gonzalez) corroborated his findings. *Id.* at 20–22. However, Dr. Bauer disregards the significance of plaintiff's evidence, including the CDCR's determination of him as disabled just two weeks before he was transferred to the Jail. It is for a jury at trial, not

---

[9] *Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (disability verification form stating that prisoner was "mobility impaired" and required a "bottom bunk" and "ground floor cell" stated valid claim that he had an objectively serious medical need); *Ivory v. Miranda*, No. 2:12–cv–2902 AC P, 2014 WL 172635, at *4 (E.D. Cal. Jan. 15, 2014) ("Because plaintiff alleges . . . mobility impairment . . . and chronic and substantial pain, his knee condition plainly constitutes a serious medical need."), *report and recommendation adopted*, 2014 WL 897125 (E.D. Cal. Mar. 6, 2014); *Stringham v. Bick*, No. 2:09–cv–0286 MCE DAD P, 2013 WL 5603466, at *46 n.2 (E.D. Cal. Oct. 11, 2013) ("[A] reasonable juror could conclude that plaintiff's . . . mobility challenges . . . constitute objective, serious medical needs." (citing *McGuckin*, 974 F.2d at 1059–60)), *report and recommendation adopted*, 2014 WL 1270549 (E.D. Cal. Mar. 26, 2014); *Castle v. Scribner*, No. 1:04-cv-06624-SMS PC, 2008 WL 752471, at *8 (E.D. Cal. Mar. 19, 2008) ("Plaintiff is unquestionably a disabled inmate with permanent mobility impairment to his lower extremities."); *cf. Bontemps v. Sotak*, No. 2:09–cv–2115 LKK EFB P, 2013 WL 178210, at *10 (E.D. Cal. Jan. 16, 2013) (citation omitted) ("[D]epriving mobility impaired inmate of wheelchair and appropriate footwear, while he continues to suffer pain and injury, may constitute[] deliberate indifference."), *report and recommendation adopted*, 2013 WL 632702 (E.D. Cal. Feb. 20, 2013); *Keel v. Early*, No. 1:99–cv–06720–AWI–SMS PC, 2010 WL 4876405, at *5 (E.D. Cal. Nov. 22, 2010) ("A prison official's failure to provide accommodations for a disabled inmate may constitute deliberate indifference to the inmate's safety in violation of the Eighth Amendment.").

a judge on summary judgment, "to weigh [this] evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249.

Dr. Sahba tersely argues that plaintiff was not mobility impaired based on Sahba's medical findings. ECF No. 138-1 at 13–14. Further, she contends that his medical records do not show why he "had been previously prescribed a wheelchair." *Id.* at 14. But, again, the threshold question is not whether a wheelchair was medically indicated. Rather, it is whether plaintiff had a medical need at all. The record includes evidence indicating etiologies for his alleged mobility impairment (e.g., fractured pelvis and car crash) and the significance of this evidence cannot be ignored. Accordingly, a jury could reasonably conclude that plaintiff had an objectively serious medical need. But, as discussed below, a serious medical need is not the end of the inquiry on these summary judgment motions.

## 2. Whether Drs. Bauer and Sahba Were Deliberately Indifferent to Plaintiff's Medical Needs

### a. Dr. Bauer

While the facts are clearly in dispute, the record before the court cannot permit a finding that Dr. Bauer was deliberately indifferent to plaintiff's medical needs. Despite plaintiff's voluminous evidence and arguments, the case boils down to a simple difference of medical opinion.

As to the need for a wheelchair, Dr. Bauer declares that, on October 28, 2009, after plaintiff declined to be examined, Dr. Bauer inquired into plaintiff's medical history at the Jail. This inquiry revealed that plaintiff had previously been housed at the Jail and did not need a wheelchair during part of that time. Later that day, Dr. Bauer observed plaintiff's legs and did not detect any atrophy. While plaintiff disagrees as to atrophy in his lower extremities, the evidence nonetheless compels the conclusion that Dr. Bauer's contrary finding reflected his honest medical judgment.

Plaintiff contends that Dr. Bauer harbored animosity against plaintiff because they previously had a "heated argument" when plaintiff initially declined to be evaluated. Plaintiff suggests that this animosity induced Dr. Bauer to make erroneous—and perhaps dishonest—

medical findings.[10]  But plaintiff does not provide any factual detail about the alleged argument or other evidence supporting the assertion that it occurred and that residual animosity from the argument, rather than Dr. Bauer's sincerely held professional opinion, accounts for the reported findings as to plaintiff's lower extremities.  Such vague and unsupported assertions are insufficient to create a triable issue of fact.  *Taylor*, 880 F.2d at 1045.

Additionally, plaintiff contends that it was impossible for Dr. Bauer to tell whether he had atrophy in his legs because he wore loose-fitting cotton pants.  Dr. Bauer not only declares otherwise, but he came to the same conclusion on October 31, 2009—just three days later.  Thus, even if Dr. Bauer's observation was inaccurate, the evidence does not support the conclusion that he did not truly believe that there were no objective signs of atrophy.

At the October 31 examination, Dr. Bauer found plaintiff to be an inconsistent historian who changed his story and reason why he required a wheelchair.  While plaintiff disputes this characterization of their conversation, the dispute is neither genuine nor material.  Dr. Bauer did not base his decision to cancel a wheelchair prescription only on his finding that plaintiff provided an unreliable medical history.  Rather, he specifically observed on medical examination that plaintiff "had normal muscle tone throughout, and a negative Babinski reflex," meaning that he had "no signs of muscle weakness, muscle control deficits, or coordination losses in the lower extremities."  ECF No. 140-4 at 6.  Further, Dr. Bauer declares that plaintiff "appeared to be quite fit [with] a muscular build."  *Id.*  Additionally, Dr. Bauer observed that, while plaintiff "lifted his legs off the ground" when being taken upstairs, he stated during the exam that he "could not move his legs off the floor."  *Id.*  Based on his observations and medical findings, Dr. Bauer declined to give plaintiff a wheelchair.  Dr. Bauer discussed these findings and conclusions with Dr. Sotak, who agreed with them.  Therefore, even if one were to assume that Dr. Bauer mistakenly concluded that plaintiff was a poor historian or did not need a wheelchair, there is no evidence upon which a reasonable jury could conclude that Dr. Bauer's stated conclusions do not

/////

_____

[10] Dr. Bauer disputes plaintiff's characterization of a "heated argument" and states simply that plaintiff was argumentative and refused to be examined.  ECF No. 164 at 110, 112.

reflect his honest medical judgment, notwithstanding plaintiff's conclusory statements to the contrary.

Other factors support the conclusion that Dr. Bauer was not deliberately indifferent to plaintiff's medical needs. Based on his findings from the October 31 examination, he concluded that a wheelchair was contraindicated because it might cause him "severe muscular and neurological deficits due to prolonged non-use of healthy, normal, and necessary muscles of the human anatomy." ECF No. 140-4 at 7. Further, despite his finding that a wheelchair was unnecessary and potentially harmful, Dr. Bauer accommodated plaintiff by prescribing him a wheelchair for prolonged distances (e.g., court appearances). *Id.* These facts, which are not reasonably in dispute, undercut the inference that Dr. Bauer knew of and deliberately disregarded excessive risks to plaintiff's health. Rather, they compel the conclusion that he honestly believed that his orders promoted his health.

Subsequent events also support the conclusion that Dr. Bauer was not deliberately indifferent to plaintiff's medical needs. In November, 2009, he was informed by Nurse Gonzalez that plaintiff was observed squatting and speaking into his toilet. He was further informed by deputies that plaintiff was observed exercising in his cell.[11]

Dr. Bauer's January 23, 2010 update to plaintiff's medical orders, likewise, shows that he was not deliberately indifferent. He found that plaintiff could walk and needed a wheelchair only to go to court. ECF No. 140-4 at 8. He made this update in response to Dr. Sotak's medical chart entry that plaintiff was hoarding pain medication in his cell. *Id.* Plaintiff disputes that he was caught hoarding prescription pain medications, declaring they were only over-the-counter pain pills. ECF No. 164 at 55, 79. Whether the pain medications were prescription or not is beside the

---

[11] Plaintiff disputes these accusations and contends that they are hearsay. However, the hearsay rule does not bar evidence "offered not to provide the truth of the matter asserted but . . . to show [a party's] state of mind." *United States v. Makhlouta*, 790 F.2d 1400, 1402 (9th Cir. 1986) (citing Fed. R. Evid. 801(c); McCormick's Handbook of the Law of Evidence § 249, at 733–34 (3d ed. 1984)). Here, the issue is whether Dr. Bauer was "subjectively aware of the risk" to plaintiff's health. *Farmer*, 511 U.S. at 829. The information relied on by Dr. Bauer bears directly on that issue. Thus, the statements are admissible to show whether he actually believed that plaintiff needed a wheelchair, and they undermine any inference that he did.

point. Again, the question is whether, in Dr. Bauer's honest medical opinion, plaintiff had chronic lower-extremity weaknesses requiring full-time use of a wheelchair for mobility. That plaintiff was hoarding his pain medication of any kind was "a strong indication that [he did] not have chronic pain as claimed." ECF No. 140-4 at 9. Moreover, Dr. Sotak's chart entry notes that, consistent with Dr. Bauer's prior findings, plaintiff was observed standing up and that he was malingering. These observations, even if assumed to be partially mistaken, buttress the inference that Dr. Bauer did not subjectively believe that he needed a wheelchair.

Dr. Bauer's February 24, 2010 examination further demonstrates that he was not deliberately indifferent to plaintiff's health. Plaintiff reported that chronic hip pain was causing his inability to walk, a complaint which Dr. Bauer found inconsistent with plaintiff's statement in October 2009 that it was back and thigh pain that prevented him from walking. Dr. Bauer offered to order X-rays of the hip, but plaintiff refused. Plaintiff disputes these assertions but fails to submit evidence from which a reasonable inference could be made that Dr. Bauer did not rely on that information or actually make these findings. On the record before the court, a reasonable fact finder could only conclude that the reasons stated by Dr. Bauer for denying the wheelchair reflected his "honest medical judgment." *Jackson*, 90 F.3d at 332.

Plaintiff's counterarguments lack merit. He argues that Dr. Sahba's determination on October 30, 2009 that he required a wheelchair shows that Dr. Bauer was deliberately indifferent to his alleged need for one. Similarly, he argues that that Dr. Sotak's May 4, 2010 decision to grant his request for a wheelchair shows that Dr. Bauer's discontinuation of his wheelchair prescription was deliberately indifferent. However, these allegedly contrary opinions reflect, at best, disagreements of medical opinion between Dr. Bauer and other doctors. Mere differences of opinion between doctors, without more, do not prove deliberate indifference. Moreover, Dr. Sotak declared that he granted plaintiff's request so that custody staff did not have to constantly deal with his theatrical crawling on the floor. Plaintiff has submitted no evidence from which a juror could reasonably infer otherwise.

Plaintiff also contends that Dr. Bauer disregarded his medical records from other penal institutions. These records, he contends, proved that he needed a wheelchair. *See* ECF No. 22 at

7; ECF No. 164 at 42, 69, 95. But, assuming that Dr. Bauer had access to these records, his contrary findings reflect a mere disagreement of medical opinion between Dr. Bauer and plaintiff's previous medical providers. Plaintiff's evidence does not show that Dr. Bauer's contrary opinion "was medically unacceptable under the circumstances" and formed "in conscious disregard of an excessive risk to [his] health." *Jackson*, 90 F.3d at 332 (citations omitted).

Further, plaintiff contends that Dr. Bauer was deliberately indifferent to the need for a wheelchair because he and other medical staff saw plaintiff crawling around the prison. But, to reiterate, the evidence shows that Dr. Bauer did not actually believe that plaintiff was disabled and in need of a wheelchair. That plaintiff insisted on crawling does not create a genuine dispute as to whether Dr. Bauer has misrepresented his clinical observations and treatment judgments and was instead deliberately indifferent to plaintiff's health.

Additionally, plaintiff contends that he was prescribed a wheelchair and physical therapy when he returned to DVI. *See* ECF No. 140-5 at 30; ECF No. 164 at 129–30, 255, 295–96, 300. In his opinion, this shows that Dr. Bauer improperly cancelled the prescriptions for a wheelchair and physical therapy. However, assuming this is true, the evidence still shows that Dr. Bright examined plaintiff on November 3, 2010 and found that he was not disabled and did not require a wheelchair. ECF No. 140-5 at 32–33. Subsequently, on December 8, 2010, the CDCR removed him from its disability placement program. *Id.* at 31. Thus, the evidence is conflicting as to whether plaintiff was diagnosed as disabled when he returned to DVI. In any event, even if plaintiff established his version of the facts, the evidence shows a mere difference in opinion between Dr. Bauer and subsequent medical providers, which does not amount to deliberate indifference.

Plaintiff also stresses that he was prescribed methadone when he left the Jail and returned to the custody of the CDCR. ECF No. 164 at 84, 284. This, in his opinion, shows that Dr. Bauer inadequately treated the pain caused by his alleged mobility impairment. But this argument disregards the undisputed fact that he was caught hoarding medication in his cell, which precluded Dr. Bauer from prescribing methadone under Jail policy. And, while plaintiff disputes

that he was hoarding methadone, a reasonable juror could only conclude that Jail officials believed otherwise. Moreover, he acknowledges that he received other pain medications at the Jail despite the hoarding incident. ECF No. 164 at 83–84, 281. These facts could not enable a jury to reasonably conclude that Dr. Bauer's medical judgment that a wheelchair was contraindicated amounted to deliberate indifference.

Finally, plaintiff contends that the grievance coordinator did not address his complaints and improperly denied his grievance based on Dr. Bauer's input. *See* ECF No. 164 at 91. Likewise, he avers that Dr. Bauer's "influence" caused him to experience further "harassment and retaliation." *Id.* This argument rehashes his First Amendment retaliation claim against Dr. Bauer, which the court already dismissed. ECF No. 24 at 2.

For these reasons, summary judgment should be granted to Dr. Bauer on plaintiff's claim of deliberate indifference to medical needs.

### b. Dr. Sahba

The record as to Dr. Sahba indicates that she, too, was not deliberately indifferent to plaintiff's medical needs. The record does not support plaintiff's contention that Dr. Sahba found at the October 30, 2009 examination that he was disabled and required full-time wheelchair use and, therefore, allowed him to keep his wheelchair. Rather, the record shows that Dr. Shaba "allow[ed] [plaintiff] to keep his wheelchair *for the time being*" because she "could not . . . rule out that he was feigning his condition." ECF No. 138-4 ¶¶ 13–14 (emphasis added).

Similarly, plaintiff asserts that Dr. Shaba promised at the same examination not to discontinue his wheelchair prescription. But assuming that plaintiff was actually able to extract that verbal promise at the examination, the medical reports fail to show any medical reasons for reissuing a prescription for a wheelchair. Further, plaintiff's assertion of a "promise" is vague and conclusory and, in the context of the record as a whole, does not reasonably support a finding that Dr. Sahba concluded that plaintiff had a genuine medical need for a wheelchair but was indifferent to that need.

Moreover, even had Dr. Sahba made this alleged "promise," the evidence fails to show that she was "responsible for" reversing Dr. Bauer's decision to cancel plaintiff's wheelchair

prescription. *See McGuckin*, 974 F.2d at 1062. Dr. Sahba declares that she was the sole physician assigned to 2 East/2 Medical or MD Sick Call. Therefore, she asserts that she "did not work with Dr. Bauer[] or oversee his work." ECF No. 138-1 at 12. Plaintiff has offered no contrary evidence beyond his vague and conclusory assertion that Dr. Sahba promised plaintiff that Dr. Bauer would not take his wheelchair.

Nor do medical records as to Dr. Sahba's three subsequent examinations (February 19, 2010, March 26, 2010, and May 20, 2010) suggest deliberate indifference. At each one, plaintiff complained of various ailments unrelated to his alleged mobility impairment and need for a wheelchair. Dr. Sahba declares that she treated them, ECF No. 138-4 ¶¶ 16–24, and plaintiff has offered no evidence showing otherwise.

Granted, he asserts that he asked for a wheelchair at the February 19, 2010 and March 26, 2010 examinations. But plaintiff points to nothing in the medical records pertaining to those exams indicating the need for one, and Dr. Sahba does "not recall having any conversations with [him] about his wheelchair use[] after October 30, 2009." *Id.* ¶ 27. Plaintiff also asserts that Dr. Sahba had access to his medical records during these examinations, suggesting that something in those records should have caused her to conclude that plaintiff had a legitimate medical need for a wheelchair. She disputes the assertion as to access to the records, declaring that she "was not the physician assigned to review [his] medical records from DVI or San Quentin," *id.*, but the dispute is immaterial. The records do not show a clear clinical finding or medical diagnosis and judgment that a wheelchair was indicated. Thus, nothing in those records (even if available to Dr. Sahba at the time) show that either she or Dr. Bauer was deliberately indifferent to a genuine need for the chair. As Dr. Sahba noted, during the October 30, 2009 examination, she could not rule out that plaintiff was malingering. Nonetheless, in light of plaintiff's continued pressing of the matter, she allowed him to keep his wheelchair "for the time being." That would hardly enable a jury to reasonably conclude that Dr. Shaba actually determined that plaintiff needed the wheelchair but was indifferent to that need.

By the time of his May 20, 2010 consultation with Dr. Sahba, Dr. Sotak had already allowed plaintiff to have a wheelchair. And Dr. Sahba declares that she responded to all of

34

plaintiff's medical complaints during this consultation, including his desire for physical therapy. ECF No. 138-4 ¶¶ 20–24. Therefore, Dr. Sahba's actions at this consultation do not suggest deliberate indifference.

Liberally read, plaintiff's papers might suggest the argument that Dr. Sahba's prescription of physical therapy at this evaluation shows that she could have prescribed a wheelchair earlier. But, as noted, she did not work with Dr. Bauer or oversee his work, and plaintiff's evidence does not show otherwise. Furthermore, it is speculative to infer from the simple fact that Dr. Sahba prescribed physical therapy *after* Dr. Sotak approved a wheelchair that she could have prescribed a wheelchair before his approval.

Plaintiff might respond that Dr. Sahba could have prescribed physical therapy, as opposed to a wheelchair, earlier. However, plaintiff himself states that Dr. Bauer cancelled the wheelchair and physical therapy prescriptions on October 31, 2009. And, to reiterate, the evidence compels the conclusion that Dr. Sahba could not reverse Dr. Bauer's decision. Thus, a reasonable fact finder could only conclude that Dr. Sahba's decision to prescribe physical therapy at the May 20 evaluation was incidental to Dr. Sotak's May 4 approval of the wheelchair. Accordingly, a reasonable jury could not conclude from this record that Dr. Sahba was deliberately indifferent to plaintiff's medical needs by not prescribing physical therapy between October 31, 2009 (cancellation of wheelchair prescription) and May 4, 2010 (re-approval).

Plaintiff's counterarguments lack merit. He contends that he told Nurse Practitioner Austin on three occasions that he needed to see Dr. Sahba about his alleged need for a wheelchair and physical therapy and that she relayed his concerns to her. Further, he contends that Dr. Sahba saw him crawling around the prison and failed to help him. Both of these arguments fail for the reasons stated above. In short, the evidentiary record simply cannot support a conclusion that Dr. Sahba actually drew the inference that plaintiff needed a wheelchair and physical therapy.

For these reasons, the record before the court would not permit a reasonable jury to find that Dr. Sahba actually knew of and disregarded excessive risks to plaintiff's health.[12]

---

[12] None of the parties has argued that *Castro*, *see supra* at 23 n.6, created a "reckless disregard" standard for a pretrial detainee's claim for deliberate indifference to medical needs.

Accordingly, summary judgment should be granted to Dr. Sahba on plaintiff's claim of deliberate indifference to medical needs.[13]

### C. Fifth Amendment—Excessive Force

#### 1. Discussion

The Due Process Clause of the Fourteenth Amendment applies to a pretrial detainee's claim against a state actor for excessive force. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470–71, 2473, 2475 (2015). These protections are "potentially more expansive" than those under the Eighth Amendment. *Mendiola–Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir. 2016) (citations omitted). Under the Fourteenth Amendment, "courts must use an objective standard" to decide whether "force deliberately used is . . . excessive." *Kingsley*, 135 S. Ct. at 2472–73. Under the Eighth Amendment, by contrast, excessive force claims have both objective and subjective elements. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *see also Chess v. Dovey*, 790 F.3d 961, 972 (9th Cir. 2015) (the Supreme Court has "adopted a heightened subjective standard for excessive force claims—malicious and sadistic[ ]" (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986))).

Under the Fourteenth Amendment, "objective reasonableness turns on the facts and circumstances of each case particular case." *Kingsley*, 135 S. Ct. at 2473 (citing *Graham v.*

---

833 F.3d at 1071. But plaintiff's claims would fail even were this the case. "Reckless disregard" would require him "to prove more than negligence but less than subjective intent[.]" *Id.* Here, as the preceding discussion demonstrates, plaintiff's claims boil down to mere disagreements of medical opinion and are, at best, suggestive of negligence and do support a finding of deliberate indifference.

[13] Because the deliberate indifference claims against Drs. Bauer and Sahba fail on the merits, it is unnecessary to consider their argument that they are entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).
For the same reason the court need not resolve Dr. Sahba's exhaustion argument that plaintiff did not mention her in two relevant grievances that he filed. Furthermore, while the record reflects that the first grievance does not mention Dr. Sahba, considerable parts of the second grievance are illegible. Additionally, plaintiff appears to state in the second grievance that he was improperly denied a reasonable accommodation and wheelchair accessible housing. Failure to exhaust is "an affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 218 (2007). Thus, resolving this question on summary judgment on the basis of the current record appears improper.

*Connor*, 490 U.S. 386, 396 (1989)).  The following nonexhaustive list of considerations guides this inquiry:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (citing *Graham*, 490 U.S. at 396).

Courts must make this determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citing *Graham*, 490 U.S. at 396).  Also, courts must "account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (alteration in original) (citing *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).  Further, these factors are applied here in the context of a summary judgment motion.

As discussed below, genuine disputes over material issues of fact preclude summary judgment on plaintiff's excessive force claim.  If, as it must, the court credits plaintiff's percipient testimony and draws all justifiable inferences in his favor, a reasonable jury could conclude on that record that Kinder's use of force was excessive.

The inquiry as to factor one is whether the amount of force Kinder used was disproportionate to its need.  There is little dispute that plaintiff was disrupting the courtroom proceedings by "pleading" with the judge at least twice to view his disability placement form.  ECF No. 139-4 at 42; ECF No. 170 at 3.  This warranted at least some measure of force given plaintiff's disregard of verbal instructions.  Thus, Kinder would be justified in using that force reasonably necessary to remove plaintiff from the courtroom and to handcuff him.  *United States v. Burton*, 194 F. App'x 822, 824 (11th Cir. 2006) (per curiam) (deputy's job was to "subdue and handcuff and individual who was being disruptive to court proceedings").  While Kinder asserts that he only used that level of force, plaintiff, himself a percipient witness, alleges much more

37

force than that. He declares that, while dragging him across the floor, Kinder put him in a choke hold/headlock and "chok[ed] him out." ECF No. 170 at 4. Further, he declares that Kinder threw him down the stairs, again causing him to lose consciousness, *id.*, and it is undisputed that he "fell down the stairs," *id.* at 88. Additionally, he declares that he offered no resistance during the incident. *Id.* at 4. Thus, taking his testimony as true, factor one weighs in plaintiff's favor. *Cf. Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (citation omitted) ("[E]ven where some force is justified, the amount actually used may be excessive.").

Under factor two, a jury could also reasonably conclude that Kinder's use of force harmed plaintiff. Plaintiff declares that he "came to at the middle landing of the stairs in pain." ECF No. 170 at 4. Subsequently, he was transported to Sutter General Hospital. Kinder states that his x-rays revealed no injury. ECF No. 139-3 at 4. While there are no x-ray images depicting bone or other injury, the medical records from that visit state that plaintiff's back showed "mild diffuse tenderness to the T-spine and LS spine," and he was diagnosed with "[a]cute cervical strain" and "[c]hronic neck and back pain." ECF No. 170 at 72–73. Further, the records show that he was "medicated" with "Tylenol 975 mg" and taken back to the Jail "via wheelchair." *Id.* at 74–76. Additionally, he asserts that Dr. Sahba treated him for chronic "nerve pain in his leg and neck" exacerbated by the alleged assault, *id.* at 20, which included prescribing him with MS Contin (morphine) and Naprosyn, *id.* at 20, 78; *see also id.* at 132–33, 137–44, 161–66. Moreover, he asserts that Kinder's force caused or exacerbated several physical and mental conditions. They include: "abrasions to his head, leg[s], and neck," *id.* at 17; headaches, nightmares, and problems sleeping and eating, *id.* at 132–34, 146–47, 149, 153, 155, 159; and "serious and extensive mental pain," *id.* at 17, including PTSD and depression, *id.* at 21, 110, 125–26, 113–16, 118–20, 132–33. Thus, while it can be debated whether these injuries are severe, they are more than *de minimis* and resolution of the question must be resolved by the jury. If a jury credits plaintiff's testimony, it could reasonably conclude that he sustained back and neck pain and exacerbation of previous injuries.

/////

/////

38

1    Under factor three, taking plaintiff's testimony as true, a jury could also reasonably

2    conclude that Kinder made little or no effort to temper or limit the amount of force.  O'Brien and

3    Kinder declare that Kinder asked plaintiff to leave the courtroom and that Kinder started

4    removing plaintiff after he did not respond to the request.  ECF No. 139-4 at 42, 48.  Plaintiff

5    declares that Kinder did not order him to leave the courtroom holding area (i.e., cage) and that he

6    (plaintiff) did not refuse any such order.  ECF No. 170 at 2–4.  Which version to believe is

7    material to this claim and is a question that must be resolved by a jury at trial and not on summary

8    judgment.

9    Similarly, the witnesses' testimony as to factor four conflicts in material ways.  According

10   to Kinder and O'Brien, plaintiff disrupted the proceedings by asking the judge to order the return

11   of his wheelchair, and it was imperative for the deputies to restore order to the courtroom.[14]

12   Plaintiff declares that he did not refuse an order to leave the courtroom or resist Kinder's efforts

13   to handcuff him.  If a jury were to credit plaintiff's version, it could reasonably conclude that

14   plaintiff did not pose a severe security problem.  Moreover, plaintiff declares that Kinder threw

15   him down the stairs.  Kinder disputes most of plaintiff's relevant factual assertions, including that

16   he threw plaintiff down the stairs.  In that regard, Kinder suggests that plaintiff accidentally fell

17   down the stairs, declaring that plaintiff pulled away and "slid in a slow and controlled manner

18   down [them]." *Id.* at 48.  However, plaintiff declares that Kinder threatened to throw him down

19   the stairs as he was choking him, ECF No. 170 at 4, and he has not expressly disputed this

20   assertion, *id.* at 7–8, 61–63, 68, 82.  How plaintiff went down the stairs is obviously a material

21   issue.  Depending on which version a jury believes, it could reasonably conclude that Kinder used

22   unwarranted force leading to plaintiff's fall down the stairs.  Therefore, similar to factor one, a

23   juror could reasonably find that the magnitude of the security problem did not warrant the level of

24   force applied in Kinder's response.

25   /////

26

27   [14] Kinder declares that plaintiff was sitting on the floor of the holding cage.  ECF No. 139-
28   4 at 48.  While he declares that plaintiff was "talking loudly . . . and waving his arms," *id.*, there
     is no indication that he was otherwise disrupting the proceedings.

Factors five (the threat reasonably perceived by the officer) and six (whether the plaintiff was actively resisting) favor plaintiff for the same reasons. In short, believing plaintiff's evidence and construing it favorably, he did not pose a serious threat and did not resist removal or apprehension. Accordingly, there are genuine issues for trial on his excessive force claim.

Kinder argues that plaintiff's assertion that Kinder threw plaintiff down the stairs "should be disregarded." ECF No. 139-6 at 14. Kinder contends that plaintiff "testified [at his deposition] that he was unconscious before he went down the stairs and did not regain consciousness until he came to rest at the stair landing below." *Id.* Therefore, he concludes, plaintiff is "unable to explain how he slid down the stairs." *Id.* However, plaintiff's deposition testimony is not clear on this point. While he initially states that he lost consciousness "once [he] got to the bottom of the stairwell," he also states that he lost consciousness while Kinder was choking him. ECF No. 139-5 at 5. He also goes on to state that he does not know when he regained consciousness. *Id.* But the inconsistencies are not so "clear and unambiguous to justify" disregarding this evidence. *See Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citation omitted). Rather, these observations go to the credibility of his factual contentions, the evaluation of which is "a jury function[.]" *Anderson*, 477 U.S. at 255; *see also Yeager*, 693 F.3d at 1080 (citation omitted) (courts should exercise caution in disregarding evidence on the ground that it is contradictory "because it is in tension with the principle that the court is not to make credibility determinations . . . [on] summary judgment").[15]

Plaintiff purports to testify in his declaration from his percipient observations and experiences of the event. While Kinder will be able to argue to the jury that plaintiff's testimony is not credible if it concludes that plaintiff was not conscious enough to perceive what occurred, plaintiff's declaration presents adequate information from which a foundation can be made at trial for a jury to hear and consider his account of what occurred. Construed favorably, one can read plaintiff's testimony to mean that he was going in and out of consciousness, and that he was

---

[15] Also, Kinder argues that plaintiff has made inconsistent statements about the manner in which he approached him and put him in a choke hold. ECF No. 174 at 6–7. This argument fails for the same reasons.

conscious when Kinder allegedly threw him down the stairs.  Furthermore, assuming the truth of

the allegation that plaintiff was choked, a jury will be free to consider whether choking plaintiff

into unconsciousness was warranted.  Additionally, plaintiff declares that Kinder had threatened

to throw him down the stairs while choking him.  If a jury believes that threat was made by

Kinder just prior to plaintiff's fall or slide down the stairs, it could certainly conclude that

plaintiff's regaining consciousness and finding himself at the bottom of the stairs was the result of

the threat being acted upon.  *See Santos v. Gates*, 287 F.3d 846, 851 (9th Cir. 2002) ("Simply

because [plaintiff] has no clear recollection of the [force] which he contends caused his [] injury

does not mean that his claim must fail as a matter of law.").

Additionally, Kinder argues that plaintiff cannot establish that he was injured.  ECF No.

174 at 7–8.  However, the extent of plaintiff's injury is just one nonobligatory factor in

determining whether the force used on him was reasonable.[16]  In any event, as explained above,

his evidence is sufficient to enable a jury to find that the alleged force resulted in more than *de*

*minimis* harm to plaintiff.  Kinder also argues that the medical records alone do not adequately

substantiate the injuries, and that plaintiff bases his claim of harm on his "lay opinion[.]"  *Id.* at 7.

The argument is not well taken.  Plaintiff may testify as to his own experiences of pain, and

medical records are not "necessary to prove causation when the inferences to be drawn from the

facts are within the range of common experience of the jury members."  *See Ziesmer v. Hagen*,

785 F.3d 1233, 1239 (8th Cir. 2015) (citation omitted).  Here, viewing plaintiff's evidence

favorably, a reasonable jury could find in the absence of medical records/testimony that Kinder's

force caused many of the harms he alleges (e.g., diffuse pain, abrasions, headaches, nightmares,

problems eating and sleeping, and depression).

Finally, Kinder states that, "[u]nder 42 U.S.C. [§] 1997e(e), the [alleged] lack of physical

injury means [p]laintiff's recovery . . . cannot include compensation for his alleged mental

---

[16] *See Kingsley*, 135 S. Ct. at 2473; *see also Stricker v. Township of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) ("In general, a plaintiff need not demonstrate a physical injury [to establish an excessive force claim]."); *Tekle v. United States*, 511 F.3d 839, 845 (9th Cir. 2007) (citation omitted) ("[P]ointing of a gun at someone may constitute excessive force, even if it does not cause physical injury.").

distress." ECF No. 174 at 10 n.2.  Under § 1997e(e), a plaintiff must show more than *de minimis* physical injury to recover for "mental or emotional injury suffered while in custody."  *See* 42 U.S.C. § 1997e(e); *see also Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002).  Again, however, a reasonable jury could conclude that plaintiff suffered more than *de minimis* physical injury. Therefore, summary judgment on this issue in not appropriate.

Furthermore, plaintiff requests several remedies, including nominal damages, punitive damages, and "any additional relief that the court deems just and equitable."  ECF No. 22 at 24. Section 1997e(e) does not bar such relief.  *Grenning v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014) (holding that § 1997e(e) did not apply to plaintiff alleging "various forms of physical injury and discomfort," and who sought "a declaratory judgment . . . , an injunction . . . , compensatory damages, and other relief"); *Oliver*, 289 F.3d at 630 ("To the extent that appellant has actionable claims for compensatory, nominal or punitive damages—premised on violations of his [constitutional] rights, and not on any alleged mental or emotional injuries—. . . the claims are not barred by § 1997e(e).").

For these reasons, a reasonable juror could conclude that the alleged force Kinder used on plaintiff was objectively unreasonable.  Accordingly, Kinder's motion for summary judgment should be denied.[17]

### 2. <u>Qualified Immunity</u>

Kinder also argues that qualified immunity shields him from plaintiff's excessive force claim.  But Kinder's argument is predicated on the assertion that his version of what occurred, not plaintiff's, should be credited.  In short, this issue also turns on disputed issues of material facts. /////

---

[17] *See generally Barnard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013) (alteration and citation omitted) ("We have held repeatedly that because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury."); *Santos*, 287 F.3d at 853 (citation omitted) ("[W]e have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."); *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (citing cases) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.").

Qualified immunity protects government officials from liability for civil damages where a reasonable official would not have known that his conduct violated a clearly established right. *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987). In resolving questions of qualified immunity, "courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right." *Id.* (citation and bracketing omitted). "The second prong . . . asks whether the right in question was clearly established at the time of the violation." *Id.* at 1866 (citation omitted).

A right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. Clearly established law should not be defined "at a high level of generality"; rather, it "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citation omitted). While this standard does not require "a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), courts typically should identify analogous cases, i.e., ones in which prison officials "acting under similar circumstances" violated the Eighth Amendment, *White*, 137 S. Ct. at 552. To be analogous, however, the case need not be "materially similar."[18]

In the Ninth Circuit, to assess whether a right is clearly established, courts first look to "Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010) (citation omitted). Absent binding precedent, courts should consider all relevant decisional law. *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir. 1985). Unpublished circuit and district court decisions inform the analysis. *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004); *Krug v. Lutz*, 329 F.3d 692, 699 (9th Cir. 2003). /////

---

[18] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (stating that, "in an obvious case," general legal standards may clearly establish law "without a body of relevant cases" (citing *Hope*, 536 U.S. at 738)); *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001) (citation omitted) ("[E]ven if there is no closely analogous case law, a right can be clearly established on the basis of common sense.").

In the Ninth Circuit, it was established by October 29, 2009 that "force is only justified when there is a need for force." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007). Thus, "officers [may not] use excessive force on an arrestee after he or she has surrendered, or is otherwise helpless, and is under complete control of the officers." *Barnard v. Las Vegas Metro. Police Dep't*, 310 F. App'x 990, 992 (9th Cir. 2009) (unpublished memorandum) (citing *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000)). It follows that "a reasonable officer would have known that it violated clearly established law to use a choke hold on a non-resisting arrestee who had surrendered . . . ." *Id.* at 993.[19] Similarly, it is clearly established that throwing a compliant inmate down the stairs may constitute excessive force.[20]

---

[19] *See also Seals v. Mitchell*, 331 F. App'x 480, 481 (9th Cir. 2009) (unpublished memorandum) (citations omitted) (verified complaint alleging that officers "without any provocation[] choked [the plaintiff] until he lost conscious" created triable issue of fact on excessive force claim); *Sullivan v. Allred*, 297 F. App'x 339, 342 (5th Cir. 2008) (triable issue where officers allegedly "employed a choke hold on [suspect] and brought him to the floor" even though his only offenses where "sitting in another patron's chair and walking away from [officer]"); *Gouskos v. Griffith*, 122 F. App'x 965, 977 (10th Cir. 2005) ("post-arrest . . . choking of plaintiff was constitutionally excessive in light of the fact that the plaintiff had made no additional aggressive moves or threats toward officer" (citing *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991))); *Young v. Prince George's County, Md.*, 355 F.3d 751, 757 (4th Cir. 2004) (triable issue where officer grabbed compliant suspect, put him in a headlock, and threw him to the ground); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("[A]ny reasonable [officer] . . . should have known that squeezing the breath from a compliant, prone . . . individual . . . involves a degree of force that is greater than reasonable."); *Williams v. Bramer*, 180 F.3d 699, 701, 702, 704 (5th Cir. 1999) (genuine issue for trial where officer grabbed suspect's throat and choked him even though he no longer posed a danger); *Valencia v. Wiggins*, 981 F.2d 1440, 1441, 1445, 1447 (5th Cir. 1993) (affirming district court's determination that officers' use of a "choke hold and other force . . . to subdue a non-resisting [pretrial detainee] and render him temporarily unconscious" constituted excessive force); *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1158 (N.D. Cal. 2009) (holding that officer used excessive force when he put the plaintiff in a "carotid hold" after he raised his hands above his head to surrender).

[20] *Lax v. City of South Bend*, 449 F.3d 773, 774 (7th Cir. 2006) (summary judgment improper on excessive force claim, partly because officer dragged plaintiff "down the stairs of the courthouse"); *Johnston v. City of Bloomington*, 170 F.3d 825, 826 (8th Cir. 1999) (per curiam) (triable issues where plaintiff asserted that the officers "choked him, threw him down the stairs, and stepped on his face"); *Price v. Pimentel*, No. 96-15824, 1997 WL 55401, at *1 (9th Cir. Feb. 5, 1997) (unpublished memorandum) (summary judgment improper where plaintiff and the officers disputed whether they "pushed [him] down a flight of stairs"); *Wilson v. Williams*, 997

Here, assuming plaintiff's testimony is true and taking the facts in the light most favorable to him, the evidence would permit a reasonable fact finder to conclude that Kinder choked plaintiff unconscious even though he was compliant and did not otherwise pose a security threat. It would also permit a finding that Kinder's unwarranted use of force resulted in plaintiff either falling or being thrown down a flight of stairs even though he was compliant and did not otherwise pose a security threat. As of the date of the incident, it was clearly established—inside and outside the Ninth Circuit—that such conduct constitutes excessive force. Accordingly, Kinder is not entitled to summary judgment based on qualified immunity as to plaintiff's excessive force claim.

### D. Section 1983 Malicious Prosecution[21]

---

F.2d 348, 349–50 (7th Cir. 1993) (triable issue on detainee's excessive force claim, partly because he contended that he was "thrown down a flight of concrete stairs"); *Luciano v. Galindo*, 944 F.2d 261, 262, 265 (5th Cir. 1991) (plaintiff stated an excessive force claim where he alleged that officers "shoved him down the stairs"); *Santiago v. Fenton*, 891 F.2d 373, 378, 385 (1st Cir. 1989) (noting that jury returned verdict on excessive force claim where officer grabbed suspect and "pulled him down the stairs"); *Jones v. Lewis*, 874 F.2d 1125, 1127 (6th Cir. 1989) (excessive force claim based partly on allegation that officers threw plaintiff down a flight of stairs went to trial); *Edward v. Scarsella*, No. CIV S-03-2584 LKK KJM P, 2007 WL 987875, at *5 (E.D. Cal. Mar. 30, 2007) (triable issue on inmate's excessive force claim, partly because he averred that officers dropped him as he was being carried down the stairs); *Allen v. Flowers*, No. C 01-2147 TEH(PR), 2002 WL 31398702, at *3 (N.D. Cal. Oct. 21, 2002) (allegations that officers "purposely shoved [plaintiff] down stairs" showed that they used excessive force); *Davis v. Moss*, 841 F. Supp. 1193, 1197 (M.D. Ga. 1994) (plaintiff prevailed on excessive force claim when officer shoved him "down a flight of metal stairs" even though he was "neither resisting nor threatening" him).

[21] Arguably, one can construe the second amended complaint to assert both § 1983 and state-law malicious prosecution claims. *See* ECF No. 22 at 22. However, the court found in its screening order that plaintiff stated a "§ 1983 malicious prosecution claim against defendant Kinder." ECF No. 24 at 2. This finding is sound. "Under California law, a police officer is granted statutory immunity from liability for malicious prosecution . . . ." *Asgari v. City of Los Angeles*, 937 P.2d 273, 277 (Cal. 1997); *see also* Cal. Gov't Code § 821.6 ("A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."). Furthermore, the California Government Claims Act ("the Act") requires that a tort claim against a public entity or its employees be presented to the California Victim Compensation and Government Claims Board, formerly named the State Board of Control, no more than six months after the cause of action accrues. Cal. Gov't Code, §§ 905.2, 910, 911.2, 945.4, 950, 950.2. "The . . . Act requires, as a condition precedent to suit against a public entity, the timely presentation of a written claim and the rejection of the claim in whole or in part." *Mangold v.*

"In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff must show that the defendants prosecuted him with malice and without probable cause, and that they did so for the purpose of denying him equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (alteration and citation omitted).

"Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Id.* at 1067 (citation omitted). "However, the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.* (citations omitted).

Nevertheless, conclusory allegations, standing alone, that an officer knowingly lied or misled the prosecutor "are insufficient to prevent summary judgment." *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir. 1994). Rather, "[t]o rebut the presumption of independent judgment and to survive summary judgment on a malicious prosecution claim, a plaintiff must provide more than an account of the incident in question that conflicts with the account of the officers involved." *Newman v. County of Orange*, 457 F.3d 991, 995 (9th Cir. 2006); *see also Sloman*, 21 F.3d at 1474 (granting summary judgment to officers when plaintiff did not "point to any evidence of . . . fabrication, other than the fact that [their] reports were inconsistent with [his] own account of the incidents leading to his arrest").

Here, plaintiff has submitted insufficient evidence to rebut the presumption of prosecutorial independence. His primary evidence that Kinder lied to the prosecutor is that their versions of the incident conflict. *See* ECF No. 170 at 5. Granted, he asserts that Kinder knew

*Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995); *see also State v. Superior Court of Kings County (Bodde)*, 90 P.3d 116, 123 (Cal. 2004). Thus, to state a tort claim against a public employee, a plaintiff must allege compliance with the Act. *Mangold*, 67 F.3d at 1477; *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 627 (9th Cir. 1988); *Bodde*, 90 P.3d at 123. Here, plaintiff has not alleged such compliance. ECF No. 22 at 23.

him from his prior stints at the Jail and had a vendetta against him.  *Id.* at 6.  However, he unequivocally stated at his deposition that he had no personal interactions with Kinder before or after the incident.  ECF No. 139-5 at 3.  Therefore, this assertion cannot defeat summary judgment.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (citing cases) ("[A] party cannot create a genuine issue of fact . . . by contradicting his or her own previous sworn statement . . . ."); *Oliver*, 289 F.3d at 629 (citation omitted) ("Appellant cannot generate an issue of material fact by providing contradictory statements.").  Plaintiff also alleges that "the district attorney told [his] attorney . . . that the [J]ail was forcing the [prosecutor] to press charges[] when [he] didn't want to."  ECF No. 22 at 16.  But the only evidence of correspondence between plaintiff and the prosecutor is a letter in which the prosecutor told plaintiff that the charges were dismissed for insufficient evidence, and the prosecutor makes no such representation in that letter.  ECF No. 170 at 94.  Thus, this conclusory allegation does not create a genuine dispute of material fact.

Moreover, a reasonable jury could not conclude on this record that plaintiff was prosecuted to deny him a specific constitutional right.  He seems to allege that Kinder sought to deny plaintiff his due process and Eighth Amendment rights.  *See* ECF No. 22 at 22.  But plaintiff does not explain how the prosecution furthered these ends.  Furthermore, "no substantive due process right exists under the Fourteenth Amendment to be free from prosecution without probable cause."  *Awabdy*, 368 F.3d at 1069 (citations omitted).  Additionally, the "Eighth Amendment's protections [do] not attach until after conviction and sentence."  *Graham v. Connor*, 490 U.S. 386, 393 n.6 (1989) (citation omitted).  Therefore, the prosecution did not deprive plaintiff of a specific constitutional right.

Plaintiff has not established a genuine issue for trail as to his claim that Kinder maliciously prosecuted plaintiff.  Accordingly, summary judgment for defendant Kinder should be granted on this claim.[22]

---

[22] Because no reasonable juror could find in favor of plaintiff on his malicious prosecution claim, it is unnecessary to consider the argument that Kinder enjoys qualified immunity.  *See Pearson*, 555 U.S. at 236.

**IV.    Conclusion**

Accordingly, IT IS ORDERED that:

1.    Dr. Sahba's motion to strike plaintiff's surreply (ECF No. 159) is granted; and

2.    Plaintiff's motion to supplement his opposition to Kinder's motion for summary judgment (ECF No. 169) is denied.

Further, for the foregoing reasons, IT IS RECOMMENDED that:

1.    Dr. Bauer's motion for summary judgment (ECF No. 140) be granted;

2.    Dr. Sahba's motion for summary judgment (ECF No. 138) be granted;

3.    Deputy Kinder's motion for summary judgment (ECF No. 139) be granted in part and denied in part, with the following results:

        a.    Summary judgment should be granted to Kinder on plaintiff's § 1983 malicious prosecution claim;

        b.    Summary judgment should be denied to Kinder on plaintiff's excessive force claim.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  September 25, 2017.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE